UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KATRINA CLARK,

            Plaintiff,      :

         v.

DHL SUPPLY CHAIN,      :

            Defendant.

Case No. 2:19-cv-3686
Judge Sarah D. Morrison
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on Defendant DHL Supply Chain's Motion for Summary Judgment. (Mot., ECF No. 27.) Plaintiff Katrina Clark responded (Resp., ECF No. 32), and DHL filed its reply (Reply, ECF No. 33). The Motion is now ripe for a decision.

Ms. Clark was previously employed by DHL as a warehouse packer. She filed this action alleging that DHL subjected her to a sexually hostile work environment, then retaliated against her for opposing those conditions. (Compl., ECF No. 1.) DHL moves for summary judgment on all claims. For the reasons set forth below, DHL's Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

In October 2017, Ms. Clark was hired by DHL as a seasonal employee packing orders for shipping in a DHL warehouse. (Casey Decl., ¶ 4, ECF No. 27-1.) She was later brought on as a permanent employee and, in April 2018, began

1

working in DHL's e-commerce department. (*Id.*) Before moving to the e-commerce department, Ms. Clark had a positive work experience with DHL. (Clark Dep., 89:12–14, ECF No. 27-2.)

### A.    Alleged Harassment

When Ms. Clark transferred to the e-commerce department, she reported to Yaw Akligoh. (*Id.*, 35:3–8.) Ms. Clark alleges that Mr. Akligoh made inappropriate comments to her on a daily basis. (*Id.*, 88:21–89:8.) Specifically, Mr. Akligoh offered to give Ms. Clark massages, asked if she was "on [her] monthly," implied a desire to get her pregnant, asked if her breasts and behind were "real," and told her that he would like to pull her hair. (*Id.*, 88:21–89:8, 99:18–20, 101:16–25.) Mr. Akligoh also performed a "creepy dance" that Ms. Clark felt was somehow sexual and left her feeling "nauseat[ed]." (*Id.*, 96:18–97:17.) Ms. Clark alleges that she reported Mr. Akligoh's behavior to DHL's third-party ethics reporting hotline, known as the "NEAR hotline." (*Id.*, 83:2–13.) DHL has no record of such a complaint. (Casey Decl., ¶ 22.) Ms. Clark's group was transferred away from Mr. Akligoh's supervision in early May 2018. (Clark Dep., 87:2–11.)

After the transfer, Ms. Clark reported to Zach Williams. (*Id.*, 106:5–10.) Ms. Clark alleges that Mr. Williams also offered massage as a performance incentive. (*Id.*, 106:21–22.) Further, Ms. Clark felt that Mr. Williams "would always be in [her] proximity creepily staring at [her]," made comments about her water breaks, and once commented on her pants. (*Id.*, 106:22–108:13.)

### B. Events of May 18, 2018

On Friday, May 18, 2018, Ms. Clark was involved in an incident with co-worker Lidia Nunez Vega. Late in the afternoon, as the warehouse packers were cleaning up their stations (*id.*, 39:5–7), Ms. Nunez Vega approached a trash can, deposited waste, and rounded the can to obtain a broom (Pl.'s Ex. Z, 4:00–4:10, *see* ECF No. 30). Ms. Clark was approaching the trash can as Ms. Nunez Vega began to walk away with her broom. (*Id.*, 4:10–4:13.) Their paths crossed. (*Id.*, 4:13.) Ms. Nunez Vega believed Ms. Clark had struck her, and the two women exchanged words. (*See* Casey Decl., Ex. 5, PAGEID # 150; Casey Decl., Ex. 11, PAGEID # 163–164.) Ms. Nunez Vega immediately reported the incident to Mr. Williams. (Casey Decl., Ex. 5.) Mr. Williams advised Ms. Nunez Vega to make a complaint to Human Resources, and asked Ms. Clark to speak with him. (Casey Decl., Ex. 12, PAGEID # 166–67.) Ms. Clark alleges that Mr. Williams told her that the fact she was a tall Black woman made her intimidating, and that she was being a "bitch." (Clark Dep., 49:4–9.)

### C. Reports to Human Resources

Before work on Monday, May 21, 2018, Ms. Clark called the NEAR hotline to report that Mr. Williams had been harassing her. (May 21 NEAR Report, ECF No. 32-2.) The resulting report states:

> Since 5/14/2018, Zach [Williams] has been harassing Katrina. Wherever she has been, Katrina has noticed Zach watching her. When she got some water one day, Zach made remarks about Katrina. Katrina said something about it but Zach took it the wrong way.
>
> On 5/18/2018, Zach spoke to Katrina about getting in trouble for asking

3

girls out. Zach mentioned that he had been watching Katrina all week. Zach told Katrina that she wasn't at goal with production. Zach was upset she was leaving for the day and called Katrina a "bitch" to her face. Katrina feels it could be because she wasn't interested in him. Zach's comment was very unexpected. . . .

(*Id.*) Ms. Clark also provided the following handwritten statement to HR:

I am feeling uneasy and uncomfortable working around my supervisor Zach on the third floor. He has been harassing me all week (5/14–5/18) and has been steadliy getting more agressive. He made it known that he has been watching me all week. 5/18 @ around 5:05pm and he called me a "Bitch." I feel degraded and some dignity gone because that is a defamation of my character. He also let me know that he has gotten in trouble before for asking a co-worker out to the movies. Friday's incident was witnessed by Kurnessa as he pulled me to the side of the floor to speak with me. He is constantly saying something about how knows where I am and what I seem to be doing but I expressed to him that made me feel uncomfortable and why was he watching me so much I did not like that because it did not sound work related or appropriate. I am still in a state a shock that this going on and that he called me a "Bitch" on Friday at the end of the day. I was distraught and unsure if I should come into work today. I want to resolve this situation with the correct and appropriate course of action.

(Casey Decl., Ex. 10, PAGEID # 161) (presented as written). That same day, Ms. Nunez Vega reported Friday's incident to an HR assistant. (Casey Decl., Ex. 5.)

The facility HR manager, Samantha Casey, returned to the office from vacation on Tuesday, May 22, 2018. (Casey Dep., 34:8–10, ECF No. 32-4.) She began to investigate both reports. (*Id.*, 34:11–13, 36:16–18.) Though the investigations occurred concurrently, they are separately summarized below, for clarity.

## D.    Clark-Nunez Vega Investigation

On May 22, 2018, Ms. Casey spoke with Ms. Nunez Vega. While they were speaking, Ms. Casey typed a written statement for Ms. Nunez Vega. (Casey Decl., Ex. 5. *See also* Casey Dep., 71:10–21.) Ms. Nunez Vega reviewed and signed the

statement. (Casey Dep., 72:11–19.) In relevant part, it states:

> On Friday, 5/18/2018, I went to throw my trash away first, then I went and got a broom to start sweeping at the end of the shift. After I grabbed the broom, I turned around to start walking, Katrina was walking towards me and she elbowed me in the left side, by my ribs.

(Casey Decl., Ex. 5.)

Ms. Casey interviewed Ms. Clark the next day. She typed a similar

statement, which Ms. Clark reviewed and signed.[1] (Casey Decl., Ex. 11. *See also*

Casey Dep., 40:24–41:4.) It states, in relevant part:

> At the end of the day, we were cleaning up. I went to the far trash can, across from the steps to throw something away. Lidia squeezed in front of me, tripping me, maybe she didn't see me, but as I was tripping, I touched her. I felt her, not sure what made contact, but she turned around and started saying "don't push me."

(Casey Decl., Ex. 11.)

Ms. Casey also spoke with two potential witnesses, Carletta Finch and

Kurnessa Clark. (Casey Decl., ¶ 12.) Neither witnessed the incident. (*Id*.) Mr.

Williams did not see the incident either, but told Ms. Casey:

> [Ms. Clark] explained that she was throwing something away in the trash can and Lidia purposely cut in front of her, trying to trip her and said "don't touch me" and Katrina replied "you touched me first."

(Casey Decl., Ex. 12, PAGEID # 166–67.)

Ms. Casey then obtained security footage of the incident. (Casey Decl., ¶ 13.)

She represents that she "repeatedly and carefully review[ed] the video footage"

---

[1] In deposition, Ms. Clark disputed the accuracy of the statement Ms. Casey typed. (*See, e.g.*, Clark Dep., 128:1–9.) Her complaints, however, relate to the portion of the statement addressing Mr. Williams's conduct—not the incident with Ms. Nunez Vega.

before "determin[ing] there was no evidence that Ms. Clark had tripped and that Ms. Clark's contact with Ms. Nunez [Vega] appeared intentional." (*Id*.) Ms. Casey consulted two general managers, Brad Cramer and Rob Huff, who "independently reviewed the video footage" and "independently concluded that the video showed Ms. Clark raising her elbow to contact Mr. Nunez [Vega] and the contact was not caused by Ms. Clark tripping or falling in any way." (*Id*., ¶ 14.)

### E.    Sexual Harassment Investigation

When Ms. Casey met with Ms. Clark on May 23, they also discussed the allegations against Mr. Williams. (Casey Decl., ¶ 23.) The two have drastically different recollections about what was discussed in that meeting. (*Compare, e.g.,* Casey Decl. ¶¶ 23–24, *with* Clark Dep., 128:21–25.) And, though Ms. Clark signed the typed statement that Ms. Casey prepared during their interview, Ms. Clark now maintains that it does not accurately represent her allegations against Mr. Williams. (*See* Clark Dep., 129:1–19.) Ms. Casey and Ms. Clark do agree that Ms. Casey offered to move Ms. Clark to a different department, at least temporarily. (Casey Decl., ¶ 24; Clark Dep., 125:1–10.)

Ms. Casey also spoke to Kurnessa Clark[2] and Mr. Williams about Ms. Katrina Clark's sexual harassment allegations.

Kurnessa confirmed that she overheard Mr. Williams use the word "bitch" in the Friday evening conversation with Ms. Clark, but was unable to confirm the tone

---

[2] To avoid confusion with Plaintiff Katrina Clark, the Court will refer to Ms. Kurnessa Clark as Kurnessa.

6

or context. (Casey Decl., Ex. 14, PAGEID # 172. *See also* Kurnessa Clark Dep., 52:3–17, ECF No. 27-3.) Kurnessa believes that she also told Ms. Casey that Mr. Williams had made "certain inappropriate comments" and "inappropriate suggestive gestures" towards Ms. Clark, but she could not recall specifics, and no such reports were reflected in Ms. Casey's notes from their meeting. (Kurnessa Clark Dep., 55:23–56:10. *See also* Casey Decl., Ex. 14.)

Mr. Williams denied calling Ms. Clark a "bitch." (Casey Decl., ¶ 25.) He did not deny watching Ms. Clark or commenting on her water breaks, and instead explained that he was under pressure from his superiors to improve Ms. Clark's productivity. (*Id*.) He also did not deny telling Ms. Clark about a circumstance in which he was written up for asking a co-worker to a movie. (*Id*.) In his words:

> I explained to her that I was the Supervisor on the 2nd floor and I asked a group of associates to see a new Marvel movie. One associate took it the wrong way and I was written up for that. I was using it as an example to explain that perception is reality. As, Katrina was asking me "how did I threaten Lidia" and I explained that Lidia was perceiving Katrina's behavior as threats.

(Casey Decl., Ex. 12, PAGEID # 166–67.) Ms. Casey ultimately concluded that she could not confirm whether or not Mr. Williams called Ms. Clark a "bitch." (Casey Decl., ¶ 28.) Nonetheless, he was counseled against such behavior. (*Id*.)

### F. Ms. Clark's Termination

Based on her investigation into the incident with Ms. Nunez Vega, Ms. Casey determined that Ms. Clark was both dishonest during the investigation and "intentionally elbow[ed] another employee." (Casey Dep., 68:10–12.) "Such conduct violated Class Two Work Rules #1 [(dishonesty of any kind)] and #2 [(threatening or

7

inflicting bodily harm on a co-worker)]," which are terminable offenses under DHL policy. (Casey Decl., ¶ 16. *See also* Casey Decl., Ex. 4, PAGEID # 146–47.) Citing those rules, Ms. Casey met with Ms. Clark on May 24, 2018, and terminated her employment. (*See* Casey Decl., Ex. 8, PAGEID # 156.)

## II.   PROCEDURAL BACKGROUND

Ms. Clark filed a charge with the Equal Employment Opportunity Commission and received a Right to Sue letter dated June 21, 2019. (ECF No. 1-2.) She then filed this action, asserting the following four claims against DHL: Sexual harassment (hostile work environment) under Title VII (Count I); Retaliation under Title VII (Count II); Sexual harassment (hostile work environment) under Ohio Revised Code Chapter 4112 (Count III); and Retaliation under Ohio Revised Code Chapter 4112 (Count IV). (Compl., *generally*.)

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed

in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV. ANALYSIS

### A. Counts I and III: Sexual Harassment (Hostile Work Environment)

In Counts I and III, Ms. Clark claims that DHL discriminated against her on the basis of sex by subjecting her to a hostile work environment. Under federal law, it is illegal "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Ohio law similarly provides that:

> [i]t shall be an unlawful discriminatory practice . . . [f]or any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, . . . to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A). The Sixth Circuit has recognized that "the elements and

9

legal standards for establishing unlawful sex discrimination are the same under Ohio Rev. Code § 4112.02 and under 42 U.S.C. § 2000e–2[.]" *Laderach v. U-Haul*, 207 F.3d 825, 828 (6th Cir. 2000). Accordingly, the Court will address these claims together.

To succeed on a hostile work environment claim, a plaintiff must establish that: (i) she is a member of a protected class; (ii) she was subjected to unwelcome sexual harassment; (iii) the harassment complained of was based on sex; (iv) the harassment had the effect of unreasonably interfering with her work performance and created a working environment that was intimidating, hostile, or offensive; and (v) a basis for employer liability exists. *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996), *cert. denied*, 519 U.S. 863 (1996). DHL argues that Ms. Clark has not established the fourth or fifth elements of her claim. The Court agrees.

1.      **Standard of Review: Severe and Pervasive Harassment**

The fourth element of a hostile work environment claim encompasses both objective and subjective components. That is, "the conduct must be severe enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The objective component requires courts to consider "whether the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Grace v. USCAR*, 521 F.3d 655, 678–79 (6th Cir. 2008) (internal quotation marks and

10

citation omitted). The review encompasses "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Harris*, 510 U.S. at 23. Case law sets "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Philips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017) (noting that, in many cases, overtly discriminatory statements and racial slurs did not create an actionable hostile work environment). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (cleaned up). "Conduct that is merely offensive is not actionable" as a hostile work environment claim; "the harassment must consist of more than words that simply have sexual content or connotations." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citations omitted). "[S]exual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive." *Id.* (quoting *Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998)).

### 2. Standard of Review: *Faragher/Ellerth* Affirmative Defense

DHL asserts an affirmative defense to employer liability for Ms. Clark's hostile work environment claims. Namely, DHL argues "(a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that [Ms. Clark] unreasonably failed to take advantage of any preventive or

corrective opportunities provided by [DHL] or to avoid harm otherwise." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (citing, *inter alia*, *Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). "Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a sexual harassment policy." *Id.* As to the second part, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Id.* (internal quotation and citation omitted).

Ms. Clark argues that the *Faragher/Ellerth* affirmative defense is unavailable to DHL because (i) Mr. Williams "was one of the individuals tasked with implementing [DHL's] sexual harassment policies and he had been accused of sexual harassment and inappropriate behavior multiple times prior to resigning his employment" and (ii) Ms. Clark called the NEAR hotline, submitted a written report to Human Resources, and met with Ms. Casey all within days after Mr. Williams allegedly called her a "bitch." (Resp., 17–19.)

Ms. Clark's argument is not well-taken. First, the argument ignores that she has also made allegations against Mr. Akligoh. And second, DHL's sexual harassment policies make several channels available to individuals whose complaint may be against their supervisor. (Casey Decl., Ex. 1, PAGEID # 139; Casey Decl., Ex. 2, PAGEID # 142.) The record establishes that Ms. Clark was very aware of those channels—including the NEAR hotline and direct access to HR. Ms. Clark's invocation of *Clark v. [UPS]* does not change the result. *See* 400 F.3d 341

(6th Cir. 2005). In that case, UPS was unable to avail itself of the *Faragher/Ellerth* affirmative defense at summary judgment because multiple supervisors were alleged to have witnessed the harassing conduct, but failed to report it, in violation of UPS's written policies. *Id.* at 350–51. No similar circumstance exists here. Accordingly, DHL is not barred from asserting the *Faragher/Ellerth* affirmative defense.

### 3.    Analysis

Ms. Clark alleges that the conduct of her supervisors, Mr. Akligoh and Mr. Williams, constituted the hostile work environment. (Clark Dep., 79:1–9.) Neither can sustain the claim.

> **a)    DHL is entitled to an affirmative defense to employer liability for Yaw Akligoh's alleged conduct.**

As to Mr. Akligoh's conduct, DHL has established by a preponderance of the evidence that it is entitled to an affirmative defense to employer liability. Ms. Clark testified in deposition that, during the month for which she was under his supervision, Mr. Akligoh engaged in "degrading" behavior "almost on a daily basis," including making lewd comments or innuendo, commenting on her clothes and anatomy, and doing a "creepy dance." (Clark Dep., 88:21–89:19.) Ms. Clark further testified that she called the NEAR hotline anonymously to report Mr. Akligoh's conduct "for the group." (*Id.*, 87:16–18.) She explained that she did not report the conduct under her own name for fear that she might lose her job. (*Id.*, 81:3–22.)  But Ms. Casey's declaration states that "DHL has no record of Ms. Clark reporting

harassment or any inappropriate conduct by [Mr. Akligoh] at any time during her employment," nor does it have any "record of any associate anonymously reporting harassment or inappropriate conduct by Mr. Akligoh to the third-party NEAR hotline." (Casey Decl., ¶ 22.) "Had an associate made such an anonymous report to the NEAR hotline, DHL would have a copy of that report and DHL policy would have required DHL to investigate the allegations." (*Id.*)

Unlike Ms. Clark's deposition testimony, the statements in Ms. Casey's declaration are supported by evidence in the record.[3] First, the record includes reports of Ms. Clark's two subsequent calls to the NEAR hotline. (*See* Casey Decl., Ex. 9, PAGEID # 158–59; Casey Decl., Ex. 16, PAGEID # 177–78.) Second, Ms. Casey confirmed both directly in her deposition and in the interview with corporate HR representative, Jennifer Guzman (memorialized in an investigation report[4]) that she had never received or investigated complaints against Mr. Akligoh. (Casey Dep., 93:19–24, 111:1–11.) And third, the record establishes that DHL promptly investigated Ms. Clark's complaints against Mr. Williams and offered to move her to a different department. (Casey Decl., ¶ 20, 23–24.)

---

[3] The Court notes that Kurnessa Clark apparently reported through the NEAR hotline that she believed Mr. Akligoh made inappropriate comments. (Kurnessa Clark Dep., 77:17–24.) Kurnesa admits, however, that she never reported that Mr. Akligoh made inappropriate comments towards Katrina Clark. (*Id.*, 76:15–16.)

[4] Although Ms. Casey testified to this investigation report in deposition, it was not included in the materials provided to the Court.

14

DHL has shown that it exercised reasonable care to prevent and correct sexually harassing behavior, and that Ms. Clark unreasonably failed to report Mr. Akligoh's conduct through the available channels.

> **b)  Ms. Clark fails to establish that Zach Williams's conduct constitutes severe and pervasive harassment.**

As to Mr. Williams, Ms. Clark has failed to establish that the alleged conduct was sufficiently severe and pervasive. Ms. Clark testified that, during their two weeks working together, Mr. Williams "eerily watched [her]," commented on her clothes, offered massages as productivity incentives, told her a story about getting in trouble for asking a coworker to a movie, and called her a "bitch." (Resp., 5–6.) These allegations fall far short of the "high bar" required by current law to maintain a hostile work environment claim. *See, e.g., Stacy v. Shoney's, Inc.,* No. 97-5393 142 F.3d 436 (table) (6th Cir. 1998) (finding that a male supervisor's sexual comments, leering, and inappropriate behavior over a two-month period were insufficient to establish a hostile work environment); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (reversing jury verdict for plaintiff where conduct, including off-color jokes and mysoginistic comments, "does not appear to have been more than 'merely offensive'"). *Compare Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 679 (6th Cir. 2000) (upholding jury verdict on sexually hostile work environment where evidence showed that coworker "continuously called [plaintiff] a 'b**ch,' continuously played sexually explicit rap music and videos, intentionally sent her to check on an inmate who was masturbating, contended that her menstrual cycle was

the cause of her problems, and consistently told inmates that they did not need to worry about her as she was a 'bi\*\*h' who would be fired soon. [Plaintiff] further testified that this conduct began in early March 1996 and continued for four months until her June 20 termination. Moreover, [defendant-employer's] personnel were well aware of [harasser's] conduct, but nevertheless failed to take any action."). In other words, even viewing the evidence in the light most favorable to Ms. Clark, Mr. Williams's conduct was not so severe or pervasive as to alter the conditions of her employment and create an abusive working environment.

DHL's motion for summary judgment on Counts I and III is **GRANTED**.

## B.    Counts II and IV: Retaliation

The Court next moves to Ms. Clark's retaliation claims. As above, the analysis under federal and state law are the same, *see Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008), and the two counts will accordingly be analyzed together. Where, as here, there is no direct evidence of retaliation, such claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Under this approach, a plaintiff must first establish a *prima facie* case of retaliation. *Burdine*, 450 U.S. at 252–53. Establishing a *prima facie* case creates a rebuttable presumption that the employer engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 252–53. An employer will satisfy its burden as long as it articulates a valid rationale for its decision. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

If a defendant presents a legitimate, non-discriminatory reason for the employment action, "a plaintiff will survive summary judgment only by raising a genuine issue of material fact as to whether the proffered reason is in fact a pretext for" unlawful retaliation. *Walcott v. City of Cleveland*, 123 F. App'x 171, 176 (6th Cir. 2005). "In every civil rights action it is the responsibility of the jury [to] determine whether the defendant's actions were invidious, pretextual, or improperly motivated." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000). Nonetheless, the burden of persuasion remains throughout the analysis on the plaintiff. *See Burdine*, 450 U.S. at 253.

### 1. Ms. Clark has met her *prima facie* burden.

To make a *prima facie* case on her retaliation claim, Ms. Clark must show that (i) she engaged in protected activity; (ii) her exercise of that activity was known by DHL; (iii) she was thereafter subject to an adverse employment action; and (iv) there was a causal connection between the protected activity and the adverse employment action. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

17

DHL does not dispute that Ms. Clark satisfies elements (i)–(iii). It argues only that Ms. Clark fails to show a causal connection between her report of sexual harassment on May 21, 2018, and her termination on May 24, 2018. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen*, 229 F.3d at 563 (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) and *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)). Such an inference may arise from a close proximity in time between the protected activity and the adverse employment action. *See Spellman v. Ohio Dep't of Transp.*, 244 F.Supp.3d 686, 704 (S.D. Ohio 2017) (quoting *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen*, 229 F.3d at 563. Accordingly, the Court concludes that Ms. Clark has made a *prima facie* case. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding a period of "just over three months" sufficiently close in time to infer a causal connection).

### 2.    DHL offers a legitimate, non-discriminatory reason for terminating Ms. Clark.

The burden then shifts to DHL to offer legitimate, non-discriminatory reasons for terminating Ms. Clark's employment. It does so easily. On Friday, May 18, 2018, Lidia Nunez Vega reported to her supervisor, Zach Williams, that Ms.

18

Clark pushed[5] her. (Casey Decl., Ex. 5, PAGEID # 150. *See also* Casey Decl., Ex. 12, PAGEID # 166.) Ms. Nunez Vega reported the incident to an HR assistant on Monday, May 21. (*Id.*) On Tuesday, May 22, Ms. Casey returned to the office and began investigating. (Casey Decl., ¶¶ 9–10.) After interviewing the involved parties and potential witnesses, procuring and observing surveillance footage, and consulting two general managers, Ms. Casey concluded "that Ms. Clark had not been truthful about the incident." (*Id.*, ¶¶ 10–15.) On Thursday, May 24, Ms. Clark was terminated for violating Class Two Work Rules 1 (dishonesty of any kind) and 2 (threatening or inflicting bodily harm). (Casey Decl., Ex. 8.) DHL's policy on General Work Rules clearly states that a violation of the Class Two Work Rules "is considered gross misconduct and is grounds for termination of employment on the first occurrence." (Casey Decl., Ex. 4, PAGEID # 146–47.) "[E]vidence of a violation of work rules that would have supported dismissal provides a legitimate, non-discriminatory reason." *Travers v. Cellco P'ship*, 579 F. App'x 409, 415 (6th Cir. 2014) (citations omitted).

### 3.  Ms. Clark fails to present evidence that DHL's proffered reasons are mere pretext for retaliation.

To defeat DHL's Motion, Ms. Clark must show that a genuine issue of material fact exists as to whether DHL's proffered reasons were pretext for

---

[5] Ms. Clark makes a mountain of a mole hill by emphasizing the different words and phrases that Ms. Nunez Vega and Ms. Casey use to describe the physical contact between the two women. (*See, e.g.*, Resp., 12.) Whether calling it a "push," "elbow," "nudge," or "shove," it refers to the May 18, 2018 incident. (*See* https://www.thesaurus.com/browse/push.)

retaliation. To do so, she may establish that DHL's reasons: (i) had no basis in fact; (ii) did not actually motivate the employer's action; or (iii) were insufficient to motivate the employer's action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). These three categories are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.*

A jury "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 600 (6th Cir. 2001) (quotation and citation omitted). Accordingly, to avoid summary judgment, "a plaintiff must produce sufficient evidence from which a jury could reasonably reject the defendant's explanation of why it fired her." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The evidence must suggest that the employer acted unlawfully—more than simply revealing "a dispute over the facts upon which the discharge was based[.]" *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

"[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted). To determine whether a defendant has such an honest belief, the Sixth Circuit "looks to whether the employer can establish its 'reasonable

reliance' on the particularized facts that were before it at the time the decision was made." *Braithwaite*, 258 F.3d at 494 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest.

*Smith*, 155 F.3d at 807.

Ms. Clark asserts that DHL's proffered reasons for discharging her are indeed pretext. She offers three arguments: First, Ms. Clark argues that the reasons "were insufficient to warrant her termination." (Resp., 22.) She next argues that the reasons "are based on weaknesses, inconsistencies and contradictions." (*Id.*) Finally, Ms. Clark argues that DHL did not have an honest belief in its stated reasons because its investigation into the incident with Ms. Nunez Vega "was not performed in good faith and was not reasonable." (*Id.*, 26–27.) None of these arguments is persuasive.

The first argument is easily disposed of. As stated above, DHL's written policies clearly state that Class Two Work Rule violations are terminable on the first offense.

To support her argument that "weaknesses, inconsistencies and contradictions" in DHL's case are sufficient to establish pretext, Ms. Clark cites only a Tenth Circuit opinion from 1997. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th

Cir. 1997). The case is no help. Ms. Morgan brought suit for unlawful discrimination and retaliation after she was terminated by Hilti, allegedly for excessive absenteeism. The Tenth Circuit upheld the district court's grant of summary judgment for Hilti, while invalidating the court's test for establishing pretext. The lower court required Ms. Morgan to show "(1) that Hilti's proffered reasons for terminating her were false, and (2) that Hilti's real reasons were unlawful." *Id*. at 1321. The Tenth Circuit set out the correct test (in that Circuit):

> Pretext can be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (further citation omitted)). "[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

*Id*. at 1323. Applying this standard, the court found that Ms. Morgan's "complaints based on her own perceptions of fairness"—including "that she was not disciplined for poor attendance before Hilti learned of her disability; that no other employee's attendance was so closely monitored; and that her year-end reviews showed no problem with her job performance except for the absenteeism issue"—were "of little legal significance under the circumstances of the case," and found "that [Ms.] Morgan ha[d] not cast doubt on Hilti's facially nondiscriminatory explanation for its actions." *Id*. at 1324–25.

The "weaknesses, inconsistencies and contradictions" that Ms. Clark alleges are, similarly, complaints based on her perceptions of fairness. Her varied complaints include that:

- Ms. Casey first stated that Ms. Clark was terminated for being dishonest about tripping, but later stated her belief that Ms. Clark was dishonest about intentionally touching another employee;

- Ms. Casey admitted that she was unable to determine Ms. Clark's intent by watching the surveillance video;

- Ms. Casey did not permit Ms. Clark to view the surveillance video in her interview;

- Mr. Williams was not terminated for calling Ms. Clark a "bitch";

- Ms. Nunez Vega was not terminated for being dishonest about whether the contact was a push, a punch, a nudge, or an elbow; and

- DHL's policy on dishonesty provides examples only of falsifying employment data and time records—not of dishonesty about tripping.

(Resp., 22–24.)

None of these allegations cast doubt on DHL's stated reason for terminating Ms. Clark. Instead, they reveal a dispute over the facts upon which her termination was based.[6] Ms. Clark told Ms. Casey, and maintains to this day, that she did not intentionally make contact with Ms. Nunez Vega. Her account was that she tripped, which must have caused any contact that Ms. Nunez Vega perceived (although Ms. Clark did not remember making contact and certainly did not *initiate* contact). Ms. Casey reviewed the surveillance video and saw a very different scene. She did not

---

[6] Though the Tenth Circuit characterized such complaints as "of little legal significance," this Court will apply language used in Sixth Circuit precedent binding on it.

23

see Ms. Clark trip or stumble. In view of the video evidence, Ms. Clark's account took the tenor of a schoolyard bully's excuse to teacher. But what matters now is not whether Ms. Clark in fact intended to make contact with Ms. Nunez Vega, or whether Ms. Casey's interpretation of events was in fact correct. It is whether DHL reasonably relied on the particularized facts then before it when it terminated Ms. Clark's employment. The Court finds no evidence in the record supporting an inference otherwise.

It is possible, as Ms. Clark points out in her third argument, that DHL's investigation could have been improved. But Sixth Circuit case law is clear on this point: the investigation need not be perfect. Ms. Casey interviewed Ms. Clark, Ms. Nunez Vega, Mr. Williams, and two possible witnesses—including Kurnessa Clark. She reviewed surveillance footage of the incident. And she solicited input from two facility general managers. Ms. Clark's argument that the investigation was a "sham" because she does not agree with Ms. Casey's interpretation of the video evidence is insufficient to raise an inference of pretext.

Ms. Clark has failed to present any evidence upon which a reasonable jury could determine that DHL's stated reasons for terminating her were pretext for retaliation. Accordingly, DHL's motion for summary judgment on Counts II and IV is **GRANTED**.

V.      **CONCLUSION**

For the reasons set forth above, DHL's Motion for Summary Judgment (ECF No. 27) is **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket of the United States District Court for the Southern District of Ohio.


**IT IS SO ORDERED.**

/s/ Sarah D. Morrison

**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

25